J. B. McDANIEL v. STATE.

No. A-2795.    Opinion Filed January 26, 1918.

(169 Pac. 1128.)

APPEAL AND ERROR—Sufficiency of Evidence. A judgment of conviction rendered in a trial court will not be disturbed on appeal, when there are facts and circumstances tending reasonably to support the conclusions of the jury and the judgment of the court, unless there be substantial error disclosed by the proceedings.

*Appeal from District Court, Greer County;*
*T. P. Clay, Judge.*

J. B. McDaniel was convicted of murder, and he appeals. Affirmed.

*E. M. Stewart,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J.  The plaintiff in error, J. B. McDaniel, was convicted at the January, 1916, term of the district court of Greer county, on a charge of murder, and his punishment fixed at imprisonment in the state peni-

tentiary for life. No briefs have been filed in this cause by either side, and no appearance made for oral argument on the part of the plaintiff in error. The cause was therefore submitted on the record, and will be reviewed for fundamental error only.

The information charges the plaintiff in error with the murder of his wife, Mollie McDaniel, on the 14th day of October, 1915. The proof offered on behalf of the state was wholly circumstantial. During the night of October 14th, Mollie McDaniel was found dead in bed. She was sleeping with her two children—a girl about 12 years of age, and a boy about nine; she had separated from her husband, the plaintiff in error, and had sued for divorce. McDaniel had apparently been in the railroad service in the car repairing department, and lived for a number of years in Southern California. From California he went to Oregon and engaged in farming, and from Oregon he moved to Greer county, Okla. It appears that he traded his Oregon land for a farm in Greer county; that his experience in farming in Oregon had been expensive, and his finances were reduced to such an extent that he could not move his family to Oklahoma when he came; that at a later date funds were secured from a brother of Mrs. McDaniel and sent to her. She then came to Greer county, Okla. Some hostile telegrams were sent by the plaintiff in error to Mrs. McDaniel before she left Oregon. He apparently thought she would not join him in Oklahoma and would refuse to live with him further. When Mrs. McDaniel arrived in Oklahoma she telephoned to her husband, the plaintiff in error, who came to the depot after her and the two children. From this time until the death of the deceased, it seems that there was very little peace in the family. The proof

indicates that the plaintiff in error had not infrequently choked and abused his wife, upon one occasion injuring her more or less severely and tearing her wearing apparel; that a few days prior to her death, when she had filed a suit for divorce, she charged the plaintiff in error with these acts of mistreatment in the presence of the sheriff of Greer county, and they were not denied at the time; that upon the night of the homicide, and prior thereto, the plaintiff in error had endeavored to persuade his wife to come back and live with him. She had uniformly refused to do so. She had rented apartments in a house near to the home formerly occupied by her and the plaintiff in error, and had moved into these apartments with the children. There were two other persons living in the house at the time. The deceased slept in her room with her two children. McDaniel arranged with persons owning the house to sleep in the adjoining room. The two other persons who occupied the premises were away from home on the date of the homicide. Mrs. McDaniel apparently knew that they were to be away that night and expressed to a neighbor great fear that her husband would kill her before the night had passed. McDaniel came upon the premises before time to retire and began to persuade his wife to return and live with him. She declined to do so again and went into the room where he slept and sat and talked to him for some time and finally asked him to give her the shotgun. He refused to do so at first, but finally took the shells out and gave it to her. She took it and went into her room, fastened the door, and went to bed. She had no shells herself. The only other shells found on the premises were in the trunk belonging to the plaintiff in error and were locked up. The two shells he took from the gun at the time he gave

it to his wife were retained by him. When the body of Mrs. McDaniel was discovered the gun was lying beside her and next to her person under the covers. A string had been torn from the lining of the quilt and tied around the trigger of the gun and tied to her toe. The charge went in at the right side of the neck just below the jawbone and severed the jugular vein and fractured the skull in several places. The physician testified that the shot ranged inward and upward. Death was probably instantaneous. The body was lying in a comfortable position on the left side. One of the legs was slightly drawn upward. The little boy sleeping with her was lying close to her body, and the blood seems to have saturated his person and apparel. The quilt lying over the persons upon the bed showed powder burns on the outside portion or the top of the same when seen by witnesses. The gun was beneath the quilt and other items of cover. There were two shells in the gun, only one of which had been discharged. There appeared to be some blood stains on the string which was tied to the toe of the deceased and to the trigger on the gun. Numerous experiments were made with the gun and the string for the purpose of determining whether or not the string tied upon the trigger as this one was when found would pull the trigger and discharge the gun. The first effort broke the string without throwing the trigger. The second effort did likewise, and all effort to throw the trigger when the string was tied in the manner it was found to be when first discovered proved fruitless in this respect. The only effort which succeeded in throwing the trigger was to change the manner in which it was tied so as to fasten it upon the extreme point of the same, in which manner the trigger was thrown. The plaintiff in error, testifying in his own

behalf, denied shooting his wife, and said that he heard a noise during the night which sounded like a window had fallen; that he got up and went into the room occupied by his wife and two children; that he discovered that she had been shot; that he made no outcry and did not wake the children, but dressed in a different suit from the one he had been wearing and went to call some nearby neighbors; that he left the little boy lying in his mother's blood and the little girl lying at the foot of the bed undisturbed, and, in fact, did not wake them at all. When the neighbors who were notified arrived he escorted them into the room, removed the quilt, and pointed out the gun and the manner in which it was fastened to the person of the deceased. Upon the arrival of the officers the next morning they discovered the fact that the gun would not shoot tied as it was, and that the deceased had been shot by a gun held on top of the quilt covering her person, instead of one lying under the quilt. The theory advanced by the defendant was that the deceased had committed suicide. That of the state was that the plaintiff in error had murdered the deceased.

There were no eyewitnesses, and the case of the state was therefore left to stand upon circumstantial evidence. We have read carefully the entire evidence in the record, and while it is to our minds not overwhelming, and in many respects more or less unsatisfactory, yet it cannot be said that there is not evidence tending reasonably to support the findings of the jury.

Under the uniform holdings of this court, when no error of law appears, a judgment of conviction is not reversed where there are facts and circumstances tending reasonably to support the findings of the jury and the judgment of the court. The record indicates clearly that

the trial court endeavored to and did give the plaintiff in error a fair and impartial trial. His instructions were fair, and all issues were clearly and concisely submitted to the jury in an impartial manner. Under this state of the record only one question arises, and that is whether or not the verdict of the jury is contrary to the evidence. If it is not, no reversal can be had; if it is, a reversal would follow. It is our opinion that there are many facts and circumstances shown by the record and introduced by the state which are not incompatible with the innocence of the plaintiff in error. There are other facts and circumstances, however, which are incompatible with his innocence. The more one reads the record the more thoroughly he becomes impressed with the guilt of the prisoner. It was the duty of the jury at the trial to resolve all doubts in favor of the plaintiff in error and to find him guilty only upon competent evidence beyond a reasonable doubt. The charge of the court told them that all the facts and circumstances proven should not only be consistent with the guilt of the defendant, but consistent with each other and inconsistent with any other reasonable hypothesis or conclusion than that of his guilt. In answer to this charge and many others explicitly defining the rights of the plaintiff in error, the jury, who saw and heard the witnesses testify and who were given all the facts and circumstances at first hand, returned a verdict of guilty, and fixed the punishment at life imprisonment. No fundamental error is disclosed by a most careful scrutiny of the record.

It therefore follows that the judgment must be affirmed.

Affirmed.

DOYLE, P. J., and MATSON, J., concur.